## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Dean W. Albrecht,                                    Civil No. 11-1017 (SRN/SER)

       Plaintiff,

v.                                                   **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

---

      Wayne G. Nelson, Esq., Law Offices of Wayne G. Nelson, 5500 Wayzata Boulevard, Suite 1025, Minneapolis, MN 55416, on behalf of Plaintiff.

      Lonnie F. Bryan, Esq., Office of the United States Attorney, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, on behalf of Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff  Albrecht ("Albrecht") seeks review of the Commissioner of Social Security Michael J. Astrue's ("Commissioner") denial of Albrecht's application for social security disability insurance benefits ("DIB").  This matter was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and the District of Minnesota Local Rule 72.1.  Cross-motions for summary judgment were filed [Doc. Nos. 8 and 10], and for the reasons set forth, the Court recommends Albrecht's motion for summary judgment be denied, and the Commissioner's motion be granted.

## I.     BACKGROUND

### A.     Procedural History

Albrecht protectively filed an application for DIB on October 23, 2007, alleging a disability onset date of May 6, 2007. (Admin. R. at 111-13, 138.) [Doc. No. 5]. He claimed disability due to pain in the shoulders and low back from degenerative joint disease. (*Id.* at 143.) Albrecht's applications were denied initially on November 16, 2007, and again upon reconsideration. (*Id.* at 54-60, 68-71.) Albrecht requested a hearing. (*Id.* at 72-73.) Administrative Law Judge William G. Brown ('the ALJ") heard the matter on February 9, 2010. (*Id.* at 25-51.) On March 15, 2010, the ALJ issued an unfavorable decision. (*Id.* at 10-24.) The Appeals Council denied Albrecht's request for review of the ALJ's decision on December 20, 2010. (*Id.* at 2-5.) The denial of further review rendered the ALJ's decision final. *See* 42 U.S.C. § 405(g); 20 C.F.R. § 404.981; *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992); *Wilburn v. Astrue*, 626 F.3d 999, 1002 (8th Cir. 2010). Albrecht seeks judicial review pursuant to 42 U.S.C. § 405(g).

**B.    Plaintiff's Testimony**

As of the hearing date, Albrecht was a 43-year-old high school graduate. (Admin. R. at 31, 32.) His last job was driving a fertilizer truck on a seasonal basis; after May 2007 he did not drive.[1] (*Id.* at 32, 33.) Albrecht testified he could not have continued driving because the pain in his right shoulder and low back was severe. (*Id.* at 33.) In the last few years, the pain moved up his back and was now in his shoulders as well. (*Id.* at 40.)

In 2006, Albrecht started taking hydrocodone and in 2008, he switched to oxycodone. (*Id.* at 39-40.) At the time of the hearing, he took fifteen milligrams of oxycodone, four times a day. (*Id.* at 34.) The medication helped by taking the sharp edges off the pain. (*Id.*) Even with medication, he rated his pain as six or seven out of ten on average. (*Id.*)

---

[1] Albrecht also worked as a self-employed farmer for almost twenty years, and a milker on a dairy farm for five years. (Admin. R. at 186, 144.)

2

Albrecht lived alone.  (*Id.* at 31.)  During the day, he watched television, read the paper, cooked once in a while, and did a little housework, but no yard work.  (*Id.* at 34-35.)  Throughout the day, he went from lying down, standing and walking, sitting in a chair, and lying down again.  (*Id.* at 38.)  He slept four hours at night, waking up from pain, and took naps during the day.  (*Id.* at 38-39.)  Albrecht grocery shopped once a month, and after grocery shopping, he could not do anything for a week.  (*Id.* at 35, 39.)  He had no hobbies and did not exercise regularly.  (*Id.*)  He visited family once in a while.  (*Id.*)  He smoked, but said he never had a problem with alcohol and did not use it.  (*Id.* at 35-36.)  The maximum he could lift was ten pounds.  (*Id.* at 36).  He could only walk for fifteen minutes and sit for an hour.  (*Id.* at 36-37.)  A job that required sitting all day was not feasible, because Albrecht needed to get up and walk, and then lie down.  (*Id.* at 37.)

### C.     Medical Evidence

#### 1.     Medical Records Dated Before the Alleged Onset Date of Disability

Albrecht was admitted to Community Memorial Hospital in Winona, Minnesota on January 24, 2006, with complaints of weakness, weight loss, coldness, shortness of breath, bloating, and swelling of the lower extremities.   (Tr. 205-06.)   In contrast to his hearing testimony, these records show that Albrecht previously admitted to a history of alcoholism and said he had not done any significant drinking lately, but drank at least once a day.  (*Id.*)  He had been hospitalized with significant alcohol problems in the year 2000.  (*Id.*)  Albrecht had worked as a milker at a dairy farm until three weeks before his admission.  (*Id.*)  He had no orthopedic complaints, and was not on any medications.  (*Id.*)

On physical examination, Albrecht appeared ill but was alert, conversational and affable.  (*Id.*)  He had normal range of motion but had edema in the lower extremities.  (*Id.*)  Dr. Thomas

3

Retzinger admitted Albrecht to the hospital for profound anemia.  (*Id.* at 206.)  Albrecht was treated with fluids and diuretics, and improved dramatically.  (*Id.* at 203.)  Dr. Retzinger recommended outpatient alcoholism treatment.  (*Id.* at 204.)  Albrecht's discharge medications, on February 2, 2006, included Lasix, spironolactone, Levaquin, Lortab, Ambien and Protonix. (*Id.* at 203.)[2]

Albrecht followed up with Dr. Retzinger on February 10, 2006, and was doing fairly well, but complained of back discomfort, and asked for a liquid pain medication.  (*Id.* at 236.) Dr. Retzinger prescribed Lortab elixir and ordered an x-ray of Albrecht's lumbar spine.  (*Id.*)

The x-rays, on February 21, 2006, showed minimal disc space narrowing at L4, and were otherwise unremarkable.  (Tr. 208, 219.)  Albrecht followed up with Dr. Retzinger the next day, and was "clearly doing well."  (*Id.* at 234.)  His lab work showed dramatic improvement with the exceptions of significant elevations of gamma GT[3] and liver enzymes.  (*Id.*)  Dr. Retzinger discontinued all medications except a vitamin, Protonix, "and a sleeper."  (*Id.*)[4]  Albrecht declined the CD evaluation and alcohol counseling.  (*Id.*)

_____

[2] Lasix, a brand name for the generic drug furosemide, is a diuretic used to treat cirrhosis of the liver and renal disease, among other things.  *Physician's Desk Reference* ("*PDR*") (65th ed. 2011).  Spironolactone is used to treat liver disorders.  *The Merck Manual of Diagnosis and Therapy* ("*The Merck Manual*") 210 (19th ed. 2011).  Levaquin is prescribed for pneumonia or acute bacterial infection.  *PDR* at 2707.  Lortab is a combination of hydrocodone and acetaminophen used to treat pain.  http://www.webmd.com/drugs/drug-7292-Lortab+Oral.aspx?drugid=7292&drugname=Lortab+Oral&source=0&pagenumber=4  Ambien is used for short-term treatment of insomnia.  *PDR* at 2924.  Protonix, a brand name for the generic drug pantoprazole, is used to treat gastroesophageal reflux disease (GERD). http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000177/

[3] GGT (gamma gt) is an enzyme that can be markedly increased with alcohol use and cause hepatobiliary dysfunction.  *The Merck Manual* at 227.

[4] Apparently, Albrecht's narcotic pain medication was not discontinued, because at his next appointment, Dr. Retzinger noted the hydrocodone elixir was working well.  (Admin. R. at 232).

Albrecht next saw Dr. Retzinger on March 2, 2006, for swelling in his lower extremities and an accompanying weight gain. (*Id.* at 232.) Dr. Retzinger restarted Lasix and spironolactone. (*Id.*) Dr. Retzinger also noted Albrecht continued to have significant back discomfort that was kept under reasonable control with hydrocodone. (*Id.*) On examination, Albrecht had normal range of motion of the neck, normal reflexes and negative straight leg raising. (*Id.*) Dr. Retzinger noted "x-rays are consistent with severe degenerative arthritis." (*Id.*)

Near the end of March, Albrecht saw Dr. Retzinger for follow up on alcoholic hepatitis; and he was doing quite well. (Id. at 231.) On April 21, 2006, Albrecht's gamma GT was still four times normal, but he was abstinent from alcohol. (*Id.* at 229.) Dr. Retzinger noted Albrecht was taking liquid hydrocodone for back pain, that "appeared to be quite helpful." (*Id.*) Two months later, Albrecht reported to Dr. Retzinger that he no longer drank alcohol and was doing very well, with no complaints and no other concerns. (*Id.* at 228.)

Albrecht next followed up with Dr. Retzinger for alcoholic hepatitis on December 22, 2006, and complained of some pain in the right upper abdomen. (*Id.* at 226.) Dr. Retzinger stated, "[h]is gamma GT surprisingly is unchanged from six months ago. He is no longer drinking." (*Id.*) An ultrasound of Albrecht's abdomen showed gallbladder stones" but without evidence to suggest acute cholecystitis[5] or bile duct dilatation. (*Id.* at 210.) Dr. Retzinger was not sure gallstones were the source of Albrecht's pain because the pain had gone away. (*Id.* at 225.)

---

[5] Cholecystitis is inflammation of the gallbladder. *The Merck Manual* at 273.

**2.      Medical Records Dated After the Alleged Onset Date of Disability**

Eight months later, in August 2007, Albrecht saw Dr. Retzinger for evaluation of back and chest pain, present for many months.  (*Id.* at 224.)  Dr. Retzinger noted "[h]e has been taking analgesics for it which appears to be working fairly well."  (*Id.*)  There were no abnormal findings on physical examination.  (*Id.*)  Dr. Retzinger recommended continuing Prednisone, diazepam and Lortab.  (*Id.*)[6]

Albrecht followed up with Dr. Retzinger for his back pain ten days later complaining that his medications were not working.  (*Id.* at 222.)  He also had some "vague" abdominal pains.  (*Id.*)  On examination, Albrecht's range of motion of the back was normal, but his liver was palpable.  (*Id.*)  Dr. Retzinger ordered an MRI of Albrecht's lumbar spine.  (*Id.*)  The findings from the MRI, on August 17, 2007, were as follows:

> L3-4:  Mild broad based right paracentral and foraminal disc protrusion with a small associated annular tear.  No significant central canal or neuroforaminal narrowing.
>
> L4-5:  Degenerative disc changes with a mild broad based posterior disc bulge and reactive edema within the surrounding endplates suggesting active inflammation at this level.  No significant central canal or neuroforaminal narrowing.  Mild ligamentum flavum hypertrophy.[7]
>
> L5-S1:  Mild disc space narrowing with a mild broad based posterior disc bulge.  Moderate bilateral ligamentum flavum

---

[6] Albrecht submitted a Medication Profile, printed by Dr. Wayne Kelly on April 26, 2010. (Admin. R. at 340-49.)  Although there is no corresponding treatment record from Dr. Retzinger, the Medication Profile shows Dr. Retzinger first prescribed diazepam [Valium] to Albrecht on July 30, 2007.  (*Id.* at  347.)

[7] Hypertrophy of the ligamentum flavum can cause spinal stenosis, constriction of the canals and foramina of the spine.   John R. Hesslink, MD, FACR, *Degenerative Spine Disease*, available at http://spinwarp.ucsd.edu/neuroweb/Text/sp-700.htm  Ligamentum flava are paired ligaments of yellow elastic fibrous tissue, that bind the laminae of adjoining vertebrae together. *Stedman's Medical Dictionary* 1007 (27th ed. 2000).

> hypertrophy.  No significant central canal or neuroforaminal
> narrowing.
>
> The remainder of the lumbar spine is negative.  No alignment
> abnormalities throughout.  The vertebral body heights are
> maintained.  No additional significant disc
> bulges.

(*Id.* at 253-54.)  A few days later, Dr. Retzinger wrote, "[h]is MRI reveals some degenerative changes.  He continues to have some RUQ [right upper quadrant] pain.  He has an elevated gamma GT but otherwise normal liver functions with both his albumin and enzymes."  (*Id.* at 221.)

On November 16, 2007, a state agency consulting physician, Dr. Dan Larson, reviewed the medical records in Albrecht's social security file and completed a Physical Residual Functional Capacity Assessment Form.  (*Id.* at 240-247.)  Dr. Larson concluded that Albrecht could occasionally lift and carry fifty pounds, frequently 25 pounds; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; only occasionally climb ramps or stairs, stoop or crouch; and never climb ladders, ropes or scaffolds.  (*Id.* at 241-42.)

On December 13, 2007, Albrecht told Dr. Retzinger that his hydrocodone syrup "was not working as well as it could" for his back pain, and requested something different.  (*Id.* at 257.) Dr. Retzinger recorded the following note:

> He has been talking about becoming totally disabled as he is no
> longer able to do any farm work that he was used to in the past.
> He is not drinking at this point. . . .  Apparently he needs a letter
> sent to his lawyer that involves what medicines he is on, a
> statement of his abilities & capabilities among other things.

(*Id.*)  Dr. Retzinger prescribed liquid oxycodone and referred Albrecht to physical therapy to assess his abilities.  (*Id.*)

Physical Therapist Kris Lawson at Winona Hospital Rehabilitation Services performed a functional capacity evaluation ("FCE") of Albrecht on December 27 and 28, 2007.  (*Id.* at 276-70.)   Lawson noted Albrecht's patterns of movement and physiological responses were consistent with maximal effort.  (*Id.* at 276.)  During testing, Albrecht reported discomfort in his low back, knees and shoulders.  (*Id.*)  Most of Albrecht's limitations on the subtests were attributed to low back pain.  (*Id.*) Lawson opined that objective signs coincided with Albrecht's reports of discomfort.  (*Id.*)

Albrecht exhibited unsafe body mechanics in lifting, explaining that he had weak legs and could only lift a certain way to avoid increasing his back pain.  (*Id.*)    Lawson opined Albrecht's lifting and strength limitations related to his inability to maintain lumbar lordosis[8] and decreased upper and lower extremity strength bilaterally.  (*Id.* at 279.)  His standing limitation related to an asymmetrical stance and pelvic position.  (*Id.*)  Albrecht's walking limitation related to decreased weight bearing of the left lower extremity, decreased lumbar lordosis, and decreased gluteal and quadriceps strength.  (*Id.* at 280.)  Finally, his sitting difficulties were related to an inability to maintain a symmetrical sitting posture  (*Id.*)

Lawson found Albrecht limited to lifting only five pounds rarely, requiring frequent change of position; forward bending only rarely, needing assistance with crouching and kneeling, with "some" limitation in stair climbing, limited to climbing a ladder rarely, and requiring an armrest for sitting.  (*Id.* at 278-80.)  Lawson noted that Albrecht might benefit from physical therapy strengthening to improve function, noting that he had "significant weakness in hip extensors and general weakness throughout his lower extremities."  (*Id.* at 278.)  Lawson also

_____

[8] Lumbar lordosis is concavity of the lumbar spinal column as viewed from the side.  *Dorland's Illustrated Medical Dictionary* 1090 (31st ed. 2007).

stated, "[c]lient is very focused on his pain.  He scored 136 on the Orebro Musculoskeletal Pain Questionnaire (Modified) which places him in the relatively high risk for developing long term problems."  (*Id.*)[9]

On December 28, 2007, Dr. Retzinger wrote a letter to Karl Sonneman, Albrecht's attorney, repeating the limitations found in Albrecht's FCE.  (*Id.* at 255-56.)  Albrecht's medications included oxycodone, 5 mg orally at six-hour intervals.  (*Id.* at 255.)  Dr. Retzinger also wrote, "x-rays of his back reveal "degenerative changes suggestive of fairly severe osteoarthritis."[10]  (*Id.*)  Finally, Dr. Retzinger stated, "[i]t is my opinion that Mr. Dean Albrecht is completely disabled and incapable of performing meaningful employment."  (*Id.* at 256.)

A state agency consulting physician, Dr. Jeffrey Gorman, reviewed the medical records in Albrecht's social security file on February 1, 2008, and affirmed Dr. Larson's November 16, 2007 RFC opinion.  (*Id.* at 268-270.)   Dr. Yondell Moore reviewed the record on February 29, 2008, and also affirmed Dr. Larson's opinion.  (*Id.* at 271-72.)

On August 29, 2008, Dr. Retzinger's notes describe Albrecht's chronic back condition as an ongoing problem, causing Albrecht to become "more and more debilitated."  (*Id.* at 310.)  He

---

[9]     The Orebro Musculoskeletal Pain Questionnaire (OMPQ) is a 'yellow flag' screening tool that predicts long-term disability and failure to return to work when completed four to 12 weeks following a soft tissue injury. . . . Identification, through the OMPQ, of workers at risk of failing to return to work due to personal and environmental factors provides the opportunity for treating practitioners to apply appropriate interventions (including the use of activity programs based on cognitive behavioral strategies) to reduce the long-term disability in injured workers.

(Admin. R. at 284) (explanatory notes to Orebro Musculoskeletal Pain Questionnaire.)

[10] Osteoarthritis is the most common joint disorder, and is characterized by disruption and potential loss of joint cartilage along with other joint changes.  *The Merck Manual* at 345.  Osteoarthritis usually becomes symptomatic at ages 40-50s, and is nearly universal by age 80.  *Id.*

9

further noted, "[Albrecht] used to do farm work but clearly he is unable to do that.  He tried to get a job as a driver but because of the narcotics he is taking they would not allow him to drive." (*Id.*)   Albrecht was taking 1200 milliliters of oxycodone liquid at one milligram per liter, providing reasonable control of pain during the day; but he still found it difficult to get a good night sleep.  (*Id.*)   Dr. Retzinger believed Albrecht's use of oxycodone was reasonable and nonescalating.  (*Id.*)   Examination of Albrecht's back revealed normal range of motion and normal reflexes.  (*Id.*)   Straight leg raise test was negative and sensation and circulation were intact.  (*Id.*)  Dr. Retzinger increased Albrecht's oxycodone.  (*Id.*)  Six months later, on March 4, 2009, Dr. Retzinger noted Albrecht was taking fifteen milligrams of oxycodone, four times a day.  (*Id.* at 311.)

On May 11, 2009, Albrecht's back range of motion was described as somewhat limited.  (*Id.* at 312.)  On examination, Albrecht had pain mainly over the sacroiliac joints[11] bilaterally, with no radiation.   (*Id.*)   Pressure over the sciatic notches did not produce pain.   (*Id.*)  Neurocirculatory status and reflexes were normal.  (*Id.*)  Albrecht had been unable to get liquid oxycodone, so Dr. Retzinger prescribed a five milligram pill, twelve per day.  (*Id.*)

Five months later, the oxycodone continued to work well for Albrecht's back pain.  (*Id.* at 314.)  Albrecht was going to court later that month for back pain disability.  (*Id.*)  Albrecht complained of being cold and tired all the time, with dry skin.  (*Id.*)  On examination, Albrecht's hips and femoral impulses were normal, his extremities moved equally; and his gait and station were normal.  (*Id.*)

---

[11] The sacroiliac ("SI") joints connect the sacrum and the right and left iliac bones. http://www.medicinenet.com/sacroiliac_joint_pain/article.htm  The sacrum is the triangular shaped bone in the lower portion of the spine, and the iliac bones are the two large bones that make up the pelvis.  *Id.*  The sacrum and iliac bones are held together by a collection of strong ligaments, and there is relatively little motion at the SI joints.  *Id.*  These joints support the entire weight of the upper body when erect.  *Id.*

On January 11, 2010, Dr. Retzinger wrote a "To Whom It May Concern" letter about Albrecht, stating he had treated Albrecht for ten years. (*Id.* at 274.) Dr. Retzinger stated that Albrecht had severe degenerative arthritis unresponsive to physical therapy, chiropractic adjustments, neuropathic and anti-inflammatory medicines. (*Id.*) Albrecht's pain was treated with some success with narcotic analgesics. (*Id.*) Dr. Retzinger opined Albrecht's problem was debilitating, progressive and permanent; concluding that Albrecht was incapable of meaningful employment. (*Id.*)

### 3. Medical Records Dated After the Administrative Hearing, Submitted to the Appeals Council

Albrecht saw Dr. Retzinger on March 12, 2010, for back and stomach pain, and liver function evaluation. (*Id.* at 323-24.) Albrecht's liver functions had not returned to normal level; and his epigastric distress was not well managed. (*Id.* at 324.) Dr. Retzinger refilled Albrecht's oxycodone, noting "his use appears to be reasonable and nonescalating and appropriate; allows him to stay functional despite the fact that he is disabled." (*Id.*) On physical examination, Albrecht moved his extremities equally; and his gait and station were normal. (*Id.* at 324.) Several days later, Albrecht had an upper endoscopy and biopsies, showing prepyloric erosion and mild antral gastritis. (*Id.* at 325-26.) A gallbladder ultrasound showed cholelithiasis with a mildly diffuse wall. (*Id.* at 332.) The next month Albrecht had his gallbladder removed. (*Id.* at 335-38.)

Following the ALJ's denial of Albrecht's application for social security disability benefits, Dr. Retzinger wrote to Plaintiff's attorney on April 29, 2010. (*Id.* at 350.) Dr. Retzinger stated:

> It is clear, at least to me, that Mr. Albrecht really had no obvious permanent findings (i.e. missing appendages or obvious cognitive difficulties.) I do feel that his complaints of chronic subjective

> pain and inactivity with resultant loss of conditioning and his
> inability to sustain any type of work effort for prolonged period of
> times, renders him unable to be gainfully employed.

(*Id.*)

Albrecht also submitted a May 20, 2010 letter from Dr. Timothy Buckley at Mayo Clinic

to the Appeals Council.  (*Id.* at 352.)  Dr. Buckley evaluated Albrecht rheumatologic opinion.

(*Id.*)  He noted Albrecht used to do demanding farm work and had low back pain and shoulder

pain for years.  (*Id.*)  Dr. Buckley relied upon Albrecht's FCE and the therapist's opinion that

Albrecht could not lift more than five pounds or do any repetitive lifting.  (*Id.*)  "[B]ecause of

this," Dr. Buckley opined, "I think that [Plaintiff] is unable to be gainfully employed due to

chronic severe back pain and likely degenerative arthritis of the lumbar spine."  (*Id.*)

### D.      Medical Expert Testimony

Dr. Frank Indihar testified at the hearing as a medical expert.  (*Id.* at 40-46.)  He found

two major diagnoses in the record:  lumbosacral disc disease without canal or neural foraminal

stenosis, with chronic pain and on narcotic analgesia and cholelithiasis.  (*Id.* at 41.)  Dr. Indihar

opined that Albrecht did not meet or equal a listed impairment.  (*Id.* at 41-42.)  Dr. Indihar also

opined that Albrecht's primary physician did not have any examination or objective findings

upon which to base his RFC opinions of December 2007 and January 2010.  Dr. Indihar believed

Albrecht would be limited to light exertional work with no climbing ladders, ropes or scaffolds;

and only occasionally balancing, stooping, kneeling, crouching, crawling, and lifting overhead;

and he needed to change his position from time to time.  (*Id.* at 42-43.)  Dr. Indihar agreed that

the work he described could aggravate pain.  (*Id.* at 45.)

Dr. Indihar also agreed with Albrecht's counsel that Albrecht was on a high dosage of

oxycodone.  (*Id.* at 44.)  Dr. Indihar opined that the amount of oxycodone Albrecht was taking

was not commensurate with the "amount of disease" shown on his MRI.  (*Id.*)  There is no specific objective test for pain, but there were many indications of pain that were absent in Albrecht's examinations, including positive straight leg raising, reflex changes, atrophy of a limb, and decreased range of motion.  (*Id.* at 45.)  Dr. Indihar said the MRI showed a disc protrusion with no canal stenosis or narrowing; and if an MRI was done on any number of full-time working people, it would show something similar.  (*Id.* at 46.)

> E.    **Vocational Expert Testimony**

Mitch Norman testified at the hearing as a vocational expert.  (*Id.* at 46-51.)  The ALJ asked Norman a hypothetical vocational question assuming an individual of Albrecht's age, education and work experience who was impaired by degenerative disc disease of the lumbar spine; who was capable of lifting twenty pounds occasionally, ten pounds frequently; standing or walking six hours out of an eight-hour day; sitting six hours out of an eight-hour day, with changes of position at 30-minute intervals; and could only occasionally balance, stoop, crouch, kneel, crawl or overhead reach.; prohibited from climbing ropes, ladders and scaffolds, working at heights or around dangerous machinery.  (*Id.* at 47.)  Norman testified such a person could not perform any of Albrecht's past relevant work, but could perform other light, unskilled jobs including mail clerk[12] and bench assembler.[13]  (*Id.* at 47-48.)

The ALJ's second hypothetical limited the same individual to lifting ten pounds occasionally, five pounds frequently; standing or walking two hours out of an eight-hour day; sitting six hours out of an eight-hour day; and including the remaining restrictions from the first hypothetical question.  (*Id.* at 48.)  Norman testified such a person could not perform Albrecht's

---

[12] DOT Code 209.687-026, 4,800 jobs in Minnesota.

[13] DOT Code 706.684-022, 5,500 jobs in Minnesota.

past relevant work, but could perform other jobs including printed circuit board assembler[14] and order clerk.[15]  (*Id.* at 48-49.)  Finally, Norman testified that if the same individual had a less than sedentary residual functional capacity, and could not maintain persistence and pace necessary for competitive employment, then the individual could not perform Albrecht's past relevant work or any other jobs in the regional or national economies.  (*Id.* at 49.)  Norman also agreed that if a person were likely to miss one day of work per week due to excessive pain or fatigue, that person could not perform work in the competitive economy.  (*Id.* at 50.)

**F.      The ALJ's Decision**

On March 15, 2010 ALJ William Brown issued an unfavorable decision.  (*Id.* at 10-21.) In finding that Albrecht was not disabled, the ALJ employed the required five-step evaluation considering:   (1) whether Albrecht was engaged in substantial gainful activity; (2) whether Albrecht had severe impairments;  (3) whether Albrecht's impairments met or equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Albrecht was capable of returning to past work; and (5) whether Albrecht could do other work existing in significant numbers in the regional or national economy.  *See* 20 C.F.R. § 404.1520(a)-(f).

At the first step of the evaluation, the ALJ found Albrecht had not engaged in substantial gainful activity since May 6, 2007.  (*Id.* at 15) (citing 20 C.F.R. § 404.1571 *et seq.*).  At the second step, the ALJ found Albrecht had a severe impairment of degenerative disc disease of the lumbar spine.  (*Id.*) (citing 20 C.F.R. § 404.1520(c)).

At step three, consistent with the opinion of the medical expert, Dr. Indihar, the ALJ determined Albrecht did not have an impairment or combination of impairments that met or

---

[14] DOT Code 726.687-110, 2,900 jobs in Minnesota.

[15] DOT Code 209.567-014, 6,500 jobs in Minnesota.

14

medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) (citing 20 C.F.R. §§ 404.1520(d), 1525-26).

At step four of the evaluation, the ALJ was required to consider Albrecht's subjective complaints as well as the objective medical evidence. (*Id.*)  The ALJ observed Albrecht said his employer would not allow him to return to work in September 2007, because he was on prescription pain medication. (*Id.* at 17.)  This observation acknowledged Albrecht's allegation that his medication made him drowsy, and limited him from any work at heights or around dangerous machinery. (*Id.*)  The ALJ also accommodated Albrecht's complaint of difficulty standing for any extended period of time in the RFC. (*Id.*)

The ALJ gave great weight to the medical expert's light RFC opinion and additional restrictions of occasional balancing, stooping, crouching, crawling, and overhead reaching; no climbing ladders, ropes or scaffolds; position change from time to time. (*Id.*)  The ALJ, however, further reduced Albrecht's lifting and standing restrictions. (*Id.* at 17-18.)  The ALJ also gave some weight to the state agency consulting physicians' opinions, but adopted a more limited RFC to accommodate Albrecht's subjective complaints. (*Id.* at 18.)

Next, the ALJ considered Dr. Retzinger's opinions, and the results of the FCE. (*Id.*)  The ALJ did not give these opinions great weight, because objective medical evidence did not support the opinions. (*Id.*)  Albrecht had been treated with narcotics but did not require surgery. (*Id.*)  The FCE indicated there was significant weakness in Albrecht's hip extensors and general weakness throughout his lower extremities; Dr. Retzinger's treatment notes omitted and such findings. (*Id.*)

Dr. Retzinger characterized Albrecht's condition as "fairly severe osteoarthritis of the lumbar spine;" in contrast to Dr. Indihar's testimony that the August 2007 MRI revealed only

mild osteoarthritis of the lumbar spine.  (*Id.*)  Dr. Retzinger's opinion was inconsistent with his own examinations of Albrecht, revealing no significant edema and normal range of motion of the back.  (*Id.*)  Although Dr. Retzinger noted that Albrecht was unresponsive to physical therapy and chiropractic adjustments, there was no record of any attempt at physical therapy.  (*Id.*)  Dr. Retzinger's disability opinion was in 2010, but Albrecht had not received any medical treatment from Dr. Retzinger since December 2007.  (*Id.*)

The ALJ concluded Dr. Retzinger's opinion appeared to be based primarily on Albrecht's subjective complaints.  (*Id.*)  As an example, the ALJ stated, "the claimant advised Dr. Retzinger in December 2007 that he was totally disabled because he was unable to do the farm work he was previously able to perform.  However, the inability to perform his past work does not support a finding of disability."  (*Id.*)  The ALJ adopted some of the recommended limitations from Albrecht's FCE, including the need for frequent changes in position, and the restrictions regarding climbing ladders and kneeling.  (*Id.* at 19.)  The ALJ, however, did not agree with the conclusion that Albrecht was limited to lifting a maximum of five pounds rarely, because it was inconsistent with the objective medical evidence of record and Albrecht's minimal medical treatment.  (*Id.*)

The ALJ also discounted the FCE because it was conducted by a physical therapist and not a licensed physician and therefore was not a medical opinion.  (*Id.*)  The ALJ acknowledged the Orebro Musculoskeletal Pain Questionnaire and the physical therapist's opinion that Plaintiff gave maximal effort during the FCE.  (*Id.*)  The ALJ did not doubt Albrecht's pain and fatigue, but did not find his symptoms were "so severe as to preclude any kind of gainful employment." (*Id.* at 19.)

16

Considering Albrecht's course of medical treatment, the ALJ found it inconsistent with disabling levels of pain, noting the alleged disability onset date was May 2007, but the first treatment record was July 2007.  (*Id.*)   Additionally, there was no record of any medical treatment after December 2007.  (*Id.*)  Albrecht's daily activities of preparing meals, shopping once a month, reading the paper, watching television, and mowing his mother's lawn were also inconsistent with disability.  (*Id.*)  His work history did not support a significant motivation to return to employment, because his earnings record revealed minimal earnings for years before the May 2007 alleged onset date.  (*Id.*)   Furthermore, Albrecht did not participate in any vocational rehabilitation or other support services to assist him in finding work.  (*Id.*)

The ALJ concluded Albrecht had the residual functional capacity to perform sedentary work defined in 20 C.F.R. § 404.1567(a), requiring lifting ten pounds occasionally and five pounds frequently; standing or walking two hours in an eight-hour day; sitting six hours in an eight hour day, with a change of position at thirty minute intervals; no climbing of ropes, ladders and scaffolds; no work at heights or around hazards or hazardous machinery; occasional balancing, stooping, crouching, kneeling, and crawling; and no more than occasional overhead reaching.  (*Id.* at 16.)  Albrecht would be unable to perform his past relevant work as a farmer or milker.  (*Id.* at 20) (citing 20 C.F.R. § 404.1569).

At step five, the ALJ determined Albrecht was capable of performing other jobs existing in significant numbers in Minnesota.  (*Id.*)  The ALJ relied on the vocational expert's testimony in response to a hypothetical question containing the RFC found by the ALJ.  (*Id.* at 21.) (citing 20 C.F.R. § 404.1520(g)).

II.     STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(2)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." *Id.*

A.   **Administrative Review**

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. § 404.909(a)(1). A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. § 404.929. If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic. 20 C.F.R. § 404.967–.982. If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court. An appeal to a federal court of either the Appeals Council or the ALJ's decisions must occur within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

B.   **Judicial Review**

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). This Court's review of the Commissioner's final decision is

deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)).  A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).  Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis.  In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors:  (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments.  *Brand v.*

*Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).  Proof of disability is the claimant's burden.  20 C.F.R. § 404.1512(a).  Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion."  *Hensley*, 352 F.3d at 355.  If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently."  *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.   DISCUSSION

### A.   Residual Functional Capacity

Albrecht challenges two aspects of the ALJ's RFC determination, the ALJ's weighing of the medical opinions and the ALJ's credibility determination.  A claimant's RFC is what he or she can do despite his or her limitations.  20 C.F.R. § 404.1545(a)(1).  All relevant evidence must be considered in determining a claimant's RFC.  *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003).  "Some medical evidence" must support the ALJ's RFC finding, but the ALJ is not limited to considering medical evidence only.  *Id.* (citing *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)); 20 C.F.R. § 404.1545(c).  It is, however, the claimant's burden, not

the Commissioner's, to prove the ALJ's RFC determination. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)).

### 1.    Medical Opinions

Albrecht alleges the ALJ failed to give controlling weight to Dr. Retzinger's RFC opinions for the following four reasons. First, Albrecht contends the medical expert was a nonexamining physician whose opinion is not entitled to greater weight than the treating physician's opinion. Second, because the ALJ's sitting and standing restrictions did not match any of the physicians' opinions, Albrecht asserts the ALJ erred in drawing his own inferences rather than relying on a medical opinion concerning Albrecht's RFC. Third, Albrecht contends Dr. Retzinger's RFC opinion should have been controlling because of his diagnosis of severe degenerative arthritis, and the findings in the FCE. Finally, Albrecht claims the ALJ incorrectly rejected the FCE findings because the evaluation was performed by a physical therapist.

An ALJ is required to consider all of the medical opinions, and resolve the conflicts among those opinions. *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques support the opinion, and the opinion is not inconsistent with other substantial evidence in the record. *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008). An ALJ, however, need not accept the treating physician's opinion if it does not meet those criteria. *Clevenger v. Social Sec. Admin.*, 567 F.3d 971, 974 (8th Cir. 2009). "By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" *Cunningham v. Apfel*, 222 F.3d 496, 502 (8th Cir. 2000) (quoting *Kelley v. Cunningham*, 133 F.3d 583, 589 (8th Cir. 1998)). A physical therapist's opinion is not a "medical opinion," but it may be considered because it can shed light

on the severity of and functional limitations resulting from the claimant's impairment.  20 C.F.R. § 404.1513(a), (d); *Sloan v. Astrue*, 499 F.3d 883, 888-89 (8th Cir. 2007) (citing Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006.)

There are circumstances where an ALJ can properly rely on a non-treating physician's opinion.  *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010).  When a treating physician's RFC opinion is not substantially supported by the objective evidence, the ALJ may rely on the opinions of consulting physicians when those opinions are more consistent with the record as a whole.  *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007).  Generally, the factors the ALJ should consider in determining the weight to grant a medical opinion include the length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; supportability of the opinion; consistency of the opinion with the record as a whole; and whether the medical source is a specialist in the relevant medical area.  20 C.F.R. § 404.1527(c)(1-5).

Under the regulations, an ALJ is not required to adopt the exact RFC opinion of a physician.  An ALJ's RFC opinion must be based on some medical evidence, but the ALJ must also consider all relevant evidence in the record in arriving at his RFC determination.  RFC is considered an issue reserved to the Commissioner.   20 C.F.R. §§ 404.1545(a)(3); 404.1527(d)(2).

Dr. Retzinger had a long treatment relationship with Albrecht, a factor favoring his opinion, but is outweighed by the fact that his objective evidence did not support his RFC opinion, and the record as a whole was more consistent with the medical expert's opinion.  On December 13, 2007, Albrecht asked Dr. Retzinger to support his disability claim.  (*Id.* at 257.)

Dr. Retzinger noted Albrecht was no longer drinking, and Albrecht believed he was disabled because he could no longer do farm work. (*Id.*)

The ALJ's concluded that Albrecht's inability to do his past farming work does not establish disability under the Social Security Act. (*Id.* at 18.) Put differently, a claimant may not be disabled if he is able to perform other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1505; 1569. In supporting Albrecht's disability, Dr. Retzinger may have been unaware of social security regulations governing disability.

In response to Albrecht's request, Dr. Retzinger referred him for a functional capacity evaluation. (*Id.*) After the FCE was done, Dr. Retzinger sent a letter to Albrecht's attorney simply parroting the results of the FCE. (*Id.* at 255-56.) Dr. Retzinger's opinion of complete disability was premised upon Albrecht's lumbar x-rays that were "suggestive of fairly severe osteoarthritis." (*Id.* at 255.)

The record as a whole, including Dr. Indihar's testimony, however, contradicts with Dr. Retzinger's conclusion that Albrecht's lumbar x-rays were "suggestive of fairly severe osteoarthritis." (*Id.* at 42.) The x-rays showed minimal disc space narrowing at L4, and were otherwise unremarkable. (*Id.* at 208, 219.) Dr. Indihar testified that any number of full-time working people could be expected to have similar degenerative changes as shown in Albrecht's MRI. (*Id.* at 46; and *see* supra note 10, defining osteoarthritis.) The August 2007 MRI of Albrecht's lumbar spine showed almost entirely mild degenerative changes. (*Id.* at 253-54.) Dr. Retzinger even characterized the MRI findings as showing only "some" degenerative changes. (*Id.* at 221.) With one exception of "moderate ligamentum flavum hypertrophy," all other descriptions of the degenerative changes in Albrecht's spine used the words mild and minimal.

Nothin in the record supported Dr. Retzinger's characterization of the x-ray evidence as "fairly severe osteoarthritis."

Furthermore, the results of the FCE were inconsistent with other substantial evidence in the record, and do not support the conclusion that Albrecht was incapable of any substantial gainful employment.   First, Albrecht testified that he could sit for an hour, but the FCE recommendation was for frequent change of position.   (*Id.* at 36-37, 278-80.)   Physical examinations of Albrecht's spine were almost entirely normal, and revealed nothing to support the limitations suggested in the FCE.   (*Id.* at 224, 232, 310, 312, 314.)   Dr. Indihar testified that objective evidence of pain, such as positive straight leg raising, reflex changes, atrophy of a limb, and decreased range of motion, were absent from Albrecht's physical examinations.   (*Id.* at 45.)   The FCE indicated that, in addition to his pain complaints, Albrecht's limitations were related to poor body mechanics and limited strength, and suggested this might be improved with physical therapy may provide improvement.   (*Id.* at 278-80.)   There was no evidence in the record that Albrecht had physical therapy.   (*Id.* at 18.)

Similarly, Albrecht testified that he could lift ten pounds, which was inconsistent with the recommendation in the FCE that he should lift only five pounds rarely.   (*Id.* at 36, 278-80.)   According to the FCE Albrecht's lifting limitation was due to improper body mechanics and limited strength.   (*Id.* at 278-80.)   Similarly, in an April 2010 opinion, Dr. Retzinger opined Albrecht was disabled, in part, based on "his complaints of chronic subjective pain and inactivity with resultant loss of conditioning."   (*Id.* at 350.)   Physical therapy to increase strength may have reduced these work limitations.   *See Hall v. Chater*, 109 F.3d 1255, 1258 (8th Cir. 1997) (finding ALJ properly discounted claimant's subjective complaints of pain, in part because claimant did

not get physical therapy for back pain.)  Thus, the ALJ's discounting of FCE and Dr. Retzinger's

RFC opinion was appropriate, and Dr. Indihar's RFC opinion was entitled to more weight.

## 2.    Credibility Analysis

Albrecht contends the ALJ failed to conduct a proper credibility analysis.  First, he

asserts his work history should not have been used to discount his credibility because he was a

self-employed farmer with low earnings.  Second, Albrecht contends the ALJ should have given

him greater restrictions based on drowsiness caused by taking oxycodone.  Albrecht further

asserts his pain treatment with narcotic medication supports his credibility regarding severe pain;

and it is inconsequential that he did not have surgery, because surgery was never recommended.

Finally, Albrecht contends his minimal daily activities were not inconsistent with his pain.

In considering a claimant's subjective complaints of disability, the ALJ must assess the

claimant's credibility, applying the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322

(8th Cir. 1984).  The absence of an objective medical basis to support the degree of severity of

the subjective complaints is just one factor to be considered in evaluating the claimant's

credibility.  *Id.*  The ALJ must consider all the evidence presented relating to a claimant's

subjective complaints, including prior work record, and observations of third parties and treating

and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency, and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness, and side effects of medication; and
5. functional restrictions.

*Id.*; *see also Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007).  "Other relevant factors

include the claimant's relevant work history and the absence of objective medical evidence to

support the complaints."  *Cox v. Apfel*, 160 F.3d 1203,1207 (8th Cir. 1998).  "Subjective

complaints may be discounted if there are inconsistencies in the evidence as a whole." *Wagner*, 499 F.3d at 851.   The ALJ "must make an express credibility determination explaining the reasons for discrediting the complaints." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

The Court agrees that Albrecht's minimal daily activities are not inconsistent with his subjective complaints.   The Court also agrees that Albrecht's failure to have back surgery does not affect his credibility, because no physician recommended that he could benefit from back surgery.   Finally, the Court finds that Albrecht's low earnings might be explained by his long-term self-employment as a farmer, rather than a lack of motivation to work.   The Court, however, finds other substantial evidence in the record to support the ALJ's credibility analysis, particularly that Albrecht's infrequent evaluation for back pain and the effectiveness of his pain medication are inconsistent with total disability.

Narcotic analgesics, according to Dr. Retzinger, improved Albrecht's back pain.   In August 2007, Albrecht's pain medication was "working fairly well" but ten days later, he claimed his medications were ineffective.   (*Id.* at 222, 224.)   Then Albrecht had an MRI that showed mild degenerative changes in his spine and his medications were not changed.   (*Id.* at 221, 253-54.)   In December 2007, when Albrecht complained that his hydrocodone "was not working as well as it could;" he was switched to oxycodone.   (*Id.* at 257.)   This change in medication coincided with Albrecht's request for a disability opinion letter, including a list of the medications he was on.   (*Id.*)   There is no evidence in the record of Albrecht seeking physical therapy, after it was suggested in his December 2007 FCE that it might improve his functioning.

Albrecht did not seek treatment again for eight months, August 2008, when Dr. Retzinger noted Albrecht's medications provided reasonable control of his pain during the day, but not enough at night.   (*Id.* at 310.)   He was prescribed an extra teaspoon of pain medication per day.

(*Id.*)  Then, Albrecht did not seek treatment for another eight months, at which time his oxycodone was "working quite well." (*Id.* at 314.)  This was the only time Albrecht complained to Dr. Retzinger that his medications made him tired.  (*Id.*)  Coincidently, Dr. Retzinger noted Albrecht was going to court soon for his back pain disability.  (*Id.*)  Nevertheless, at the administrative hearing, the only medication side effect that Albrecht complained of was constipation. (*Id.* at 34.)  In January 2010, Dr. Retzinger noted Albrecht's pain was unresponsive to physical therapy, chiropractic treatments, and neuropathic and anti-inflammatory medications. (*Id.* at 274.)  As the ALJ noted, there is no evidence during the relevant time period that Albrecht had any of these treatments for pain.  (*Id.* at 18.)  It would appear that Dr. Retzinger simply repeated Albrecht's statements, regardless of their accuracy, to support his disability claim. Thus, Dr. Retzinger's opinions lack credibility on the record.

Similarly, Albrecht's infrequent evaluation of his back pain, and indications that his pain medication was effective in "fairly" or "reasonably" controlling his pain, are inconsistent with the extreme limitations suggested in the FCE and Albrecht's subjective complaints of pain too severe to perform sedentary work.  In other words, it is not credible that a person who infrequently sought medical evaluation and whose medications "fairly" or "reasonably" controlled his pain, could only lift five pounds rarely and could not sit, stand or walk for any length of time, and needed to lie down every day.  The lack of objective medical evidence to support the severity of Albrecht's subjective complaints, plus his infrequent medical evaluation and the effectiveness of pain medication in reducing his symptoms are substantial evidence supporting the ALJ's credibility determination. *See Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995) (lack of supporting objective evidence and minimal attempts to seek medical

treatment or effective medication supported the ALJ's decision to discredit the extent of the claimant's subjective complaints).

B.    **New Evidence**

When the Appeals Council has considered new material evidence but declined review, the court's task on judicial review "is only to decide whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ." *Mackey v. Shalala*, 47 F.3d 951, 953 (8th Cir. 1995); *Van Vickle v. Astrue*, 539 F.3d 825, 828 n. 2 (8th Cir. 2008).

New evidence the Appeals Council considered included a March 2010 treatment record, an April 2010 letter from Dr. Retzinger, and a May 2010 letter from Dr. Timothy Buckley. (Admin. R. at 2, 3 and 5.)  None of this evidence changes this Court's conclusion that the ALJ's decision is supported by substantial evidence in the record as a whole.    The March 2010 treatment record from Dr. Retzinger reveals that oxycodone allowed Albrecht to remain functional and his physical examination was normal.  (*Id.* at 323-24.)  This further supports the Court's finding that the objective evidence and the effectiveness of Albrecht's pain medication were inconsistent with his subjective complaints of disabling pain.

In an April 2010 letter, Dr. Retzinger disagreed with the ALJ's decision, stating:  "I do feel that [Albrecht's] complaints of chronic subjective pain and inactivity with resultant loss of conditioning . . . renders him unable to be gainfully employed."  (*Id.* at 350.)  For the reasons discussed above, Dr. Retzinger's reliance on Albrecht's subjective complaints and the results of the FCE do not change the Court's conclusion that the ALJ properly granted more weight to Dr. Indihar's RFC opinion.

In May 2010, Dr. Timothy Buckley submitted a letter, stating he saw Albrecht for a rheumatology opinion.  (*Id.* at 352.)  Dr. Buckley's treatment record itself is not in the record, nor does Dr. Buckley say anything about his own examination and evaluation of Albrecht. Instead, Dr. Buckley relied on the FCE in forming his opinion that Albrecht was disabled.  (*Id.* at 352.)  Because the Court does not find the recommendations in the FCE consistent with substantial evidence in the record as a whole, Dr. Buckley's opinion does not change this Court's conclusion that substantial evidence in the record supports the ALJ's decision.

## IV.    RECOMMENDATION

Based on all the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.     Plaintiff Albrecht's Motion for Summary Judgment [Doc. No. 8] be **DENIED**;

2.     Defendant Commissioner's Motion for Summary Judgment [Doc. No. 10] be **GRANTED**;

3.     If this Report and Recommendation is adopted, that the case be dismissed with prejudice and judgment entered accordingly.

Dated:  May 24, 2012

*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

Under D.Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 8, 2012**, a writing which specifically identifies those portions of the Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.